Statement of the Case.
MONROE, J.
This is a revocatory action, brought by an alleged creditor or the Mamou Company, Limited (which, in the course of this opinion, may be referred to as the Mamou Company, or the company), to avoid and annul, as giving illegal preference, certain acts and contracts between that company and the People’s Bank & Trust Company (otherwise designated as the bank), and to recover from the bank the proceeds of certain policies of insurance. The petition alleges, in substance:
That plaintiff has a judgment against the company for $3,768.67, with interest (subject to certain credits). That Frank Davies borrowed, at different times, beginning prior to 1908, certain sums of money, aggregating $30,000, from the People’s Savings, Trust & Banking Company, which, about November, 1909, became the People’s Bank & Trust Company.
“That said Davies was never, at any time, able to respond to his said obligations, and that said loans were at all times practically worthless, save as secured in the manner hereinafter set forth, and that the officers and managers of said bank discovered and knew, soon after they began business wjth him, that he was insolvent and unable to pay his debts, and that they made every effort to obtain from him any securities that he could furnish them for said obligations.”
That Davies caused the Mamou Company to be organized, with a capital of $30,000; the stock being taken in the names of others, but he being substantially the corporation, and directing its affairs. That he was without funds to acquire the necessary machinery for said company, or to pay its current expenses. That he obtained part of the money needed for those purposes from said bank. That the officers of the bank, being aware of the use that he intended to make of it, determined to get into their possession evidence of debt, executed by said company, to as large, an amount as possible, to the end that they might hold it for all sums loaned to Davies; said company being the real beneficiary of the loans.
“That in the latter part of the year 1907 your petitioner sold to said Davies, for his said company, a large quantity of machinery, the price of which exceeded $17,000 ($20,000), upon which price there remains due the sum stated in the aforesaid judgment. That said machinery reached the city of New Orleans in the early part of the year 1908. That said Davies there *721 upon consigned the same, in his own name, to said company, then operating in Calcasieu parish, * * * drawing two drafts, on time, for $3,500 each, against said consignments, and attaching bills of lading to said drafts, which drafts were accepted for said company by a person unknown to said bank, and having no connection with the said company, and no right to accept for it, whereupon the bank, though knowing the impecunious condition of said Davies and his said company, bought the said drafts, passing the proceeds to the credit of said Davies, and making his said company the debtor of said bank, and has never made any effort to collect said drafts, all of which was done without inquiring how Davies got possession of said machinery, but with the full knowledge that he was not able to pay for it, save so far as said bank would put him in funds to do so.”
That on March 31, 1908, the company executed. a notarial act acknowledging that it owed Davies $25,000, for which it issued ten notes of $2,500 each, maturing monthly, and, to secure said notes, mortgaged all of its machinery. That the machinery was not susceptible of being mortgaged, and the officers of the bank knew it. That Davies pledged the notes to the bank to secure the loans which had been made to him; the intent and effect thereof being to create chirographic evidence of a debt by the company to the bank. That the bank has never made any attempt to collect said notes, but retains them merely as proof of a debt due by said company. That, the venture made by Davies, in the name of the company, having proved a failure, in Calcasieu parish, the outfit was removed by him, with money furnished by the bank, to the parish of Caddo, and that about June, 1909, the company procured insurance against loss by fire, under various policies, aggregating $20,000. That said insurance was upon the machinery for the price of which plaintiff has obtained the judgment hereinbefore mentioned. That the policies were shortly afterwards delivered by Davies, then acting as agent, and who was manager, of said company, to the bank, but that the insurers were not notified, and that the delivery of the policies was ineffective as to them, and as to plaintiff and other third persons who knew nothing of the transaction until about November, 1909. That about October 23, 1909, the property thus insured was destroyed by fire; the loss, upon the adjustment, being fixed at $11,492.-92. That notice of the loss was given to the insurers, who were then made aware for the first time that the policies were in the possession of the bank, and who thereupon paid the amount of said loss to the bank:
“That it was intended thereby to give to said bank, as a creditor of said Davies and said Mamou Power Company, Limited, both being then, and for years before, absolutely insolvent, to the knowledge of said bank, an illegal preference over all other creditors. That the claim of your petitioner arose long before said policies were issued, and that what is now complained of was in fraudem legis. And in the event that it be shown that said policies were delivered or assigned to said bank to secure a debt due said bank by said Davies, but not to secure a debt due by said Mamou Power Company, Limited, and in that event solely, then your petitioner avers that said delivery or assignment was absolutely null and void, for the reason that said Davies, in procuring said insurance, was the agent of the Mamou Power Company, Limited, and held said policies as its fiduciary, and could not assign, pledge, or otherwise use said policies for the purpose of paying or reducing his own debt, all of which was well known to said bank and its officers and managers. Wherefore petitioner prays that * * * any and all acts or contracts by which the aforesaid policies of insurance and the money payable thereunder passed to the said bank be declared illegal preference, given by an insolvent to a particular creditor, to the prejudice of petitioner, and to the knowledge of the transferee, and in fraudem leg-is, and that all such acts and contracts be rescinded, revoked, and annulled, and, since the avails of said policies in cash have passed to said bank, that petitioner have judgment against the People’s Bank & Trust Company in the amount of its judgment against the Mamou Power Company, Limited, with the interest,” etc.
After some exceptions and an answer by the bank, plaintiff filed a supplemental petition, alleging that the bank had been placed in the hands of liquidators and praying that they be made parties defendant, which was done, and thereafter the suit was prosecuted as against the liquidators.
Upon the trial of the case, plaintiff called as witnesses on its behalf its own president, *723 the former president, and the former assistant cashier of the bank, and the insurance agents by whom the loss was adjusted upon the occasion of the fire. Defendant called no witnesses, but introduced some documentary evidence.
E. A. Sammons testified, in part, as follows:
"Q. What is your connection with the plaintiff in this case? A. President. * * * Q. Who sold Davies that machinery ?_ A. I did. * * * Q. It was not in New Orleans? A. Not at the time the contracts were made. Some had to be built — specially designed — and took three months for some to be built. Q. To whom did you sell it? A. To the Mamou Power Company. Q. When? A. I don’t remember the date now; it is too far back. Payments were guaranteed by Frank Davies personally — notes signed by the Mamou Power Company, and signed by Frank Davies, as president. Q. Did you give instructions as to how the machinery was to be shipped? A. Yes, sir. Q. To whose order? A. Well, it was shipped in different ways. I think the machinery was shipped to us at New Orleans, and we turned over the bills of lading to Frank Davies, and he shipped beyond here, as a broker. Q. Was there anything in the bills of lading to show in what capacity Frank Davies was acting? A. Not in the bills of lading. * * * Q. You indorsed them in blank and turned them over to Frank Davies; there was nothing on the bills of lading or in the indorsement to show, to a third person, that any other party than Davies had any interest in the property covered by the bills of lading? A. No, sir. Q. Upon what terms was this machinery sold? A. Different terms, at different dates. I think the longest time was 90 days, as near as I remember. It was paid cash, some of it — there was some cash paid, and some of the cash which was not paid we did accept notes. Q. Who paid the cash? A. Frank Davies. Q. Who made the notes? A. Frank Davies. Q. Individually? A. Mamou Power Company, per Frank Davies, President. * * * Q. You didn’t know much about the Mamou Company? A. No, sir. Q. You would not have extended them credit? A. Not without Davies’ say-so. Q. The person to whom you gave credit at that time was Davies? A. Really Davies. Q. You knew how he stood in the community and among his business associates financially; what his reputation was? A. Yes, sir. Q. It was good at that time? A. It was, to the best of my knowledge. If I didn’t think so, I would not have sold. I had done lots of business with him, and he had always been right. * * * Q. You don’t know what Davies did with the bills of lading, do you? A. I am not positive; but I think he turned them over to the People’s Bank. That is what he told me himself that he did with them; went there and got .the cash on them. Q. I understood you to say that Davies had told you, at the time he was negotiating for the machinery, that, while he was acting for the power company, he was1 also acting as broker for them? A. Yes, sir; that he was producing the money — that he had the whole money raised, and, while they were only organizing as fast as they sold the stock, he would be refunded his money. Q. He told you at the time that the capital stock of the Mamou Company had not been fully paid? A. Not been sold, but that he and Mr. Hill, I think, were the only ones that had taken any amount of the stock at that time. Q. And he assumed, personally, this obligation? A. All responsibility in the payment of the bills — that he had the money put away and set aside for it. Q. I think you have stated that you would not have accepted the Mamou Company’s notes for the purchase price of the machinery without the indorsement of Frank Davies? A. No, sir; I would not. * * * Q. Did you insure the property? A. No, sir. * * * Q. But you did permit the machinery to be moved from Jennings to the Caddo field? A. Yes, sir. Q. Without requiring the delivery to you of any insurance policy covering the machinery? A. I requested it, and was supposed to get it; but I didn’t get it. Q. As a matter of fact, that property had been in Jennings from the beginning of 1908 until midsummer of 1909? A. Yes, sir. Q. How do you explain that you were willing to have the property remain in Jennings a year and a half without insurance to protect your claim, and demanded insurance because of its removal to Caddo? A. That is easily explained. It was a business oversight in writing in the contract they should take out policies the first time. That is what crops out in these things. And when they got ready to move it, I felt that there was a chance of loss in the moving, and we should be farther protected, and I didn’t know exactly how' our lien would stand in moving from one parish to another, so I took that precaution and asked him to do that, which I believed he would do, and which he did not. And the first knowledge I had that the policies were not in our name was when I came back from adjusting the loss, and they were made in the People’s Bank. Q. You made no effort to take out any insurance? A. No, sir. * * * Q. Did you ever make demand on the Mamou Company for the insurance policy ? A. I made demand on Davies; he had all the stock at the time. Q. That was before the property was moved from Jennings? A. After it was moved, I made demand, I suppose, half a dozen times. He said in a day or two he would hand me the policy. Q. When did you first learn that the policies were in the hands of the People’s Bank? A. Two days after we came back from making estimates. * * * The insurance companies handed us the policies to prorate, and I discovered the stamp — that they had been turned over to the People’s Bank. Q. Did you make any'objections or complaint— any protest against that? A. Yes, sir. Q. To whom? A. Mr. Davies — to some attorney he *725 had advising him at the time. They assured me that, if I would let it go as it was, in two days they would pay my bill or claim — if I didn’t make a fuss about the policy, they would pay every .dollar inside of two days. Q. Mr. Davies would? A. Yes, sir. Q. And you accepted his promise? A. Accepted his statement; yes, sir. Q. And you made no fuss or opposition? A. No, sir. Q. And allowed the bank to collect the losses — permitted the bank to collect the losses? A. Yes, sir.”
Mr. Joseph Collins, the former president of the bank, testified, in part, to the following effect.
“My recollection of it, of Frank Davies; he was engaged in the machinery business, buying machinery from the Sammons Company, the Vulcan Iron Works, and other machinery manufacturers, and he had sold a certain amount of oil well machinery to the Mamou Power Company, Limited. The Mamou Power Company, Limited, were slow in paying him, * * * and he was forced to call upon us, as his bankers, to furnish him more money, which we did from time to time, and which, by the way, is the best proof that we did not know that he was insolvent at the time, or we would not have put up more money.”
Being requested by plaintiff’s counsel not to argue the case, but to state the facts, he proceeded:
_ “I may not be a good witness. That is the situation. We only knew the Mamou Power Company, Limited, through Frank Davies. We lent money to Frank Davies, and he put up the collateral. I don’t doubt that we knew at the time that he was largely indebted to the Sammons Company for machinery, and probably for this machinery, but just how much he owed other people we did not know; but, as he required more money, we advanced it to him, and took collateral, and this [referring to the mortgage given by the Mamou Company] was part of the collateral.”
Mr. Hypolite Dabezies, the former assistant cashier of the bank, testified, in part and in substance:
That, when the bank discounted the two drafts (in January and February, 1908) he understood that Davies was selling the machinery represented by the bills of lading attached to the Mamou Company. That, by reason of the discount, the bank became the owner ' of the drafts and machinery. That, after the drafts were protested, the bank wrote to the company several times about them, and received answers to the effect that it expected to pay them. That the bank made no effort to take possession of the machinery because the company then — •
“gave us a general mortgage on their plant. * * * Q. They gave it to you? -A. They gave it to Frank Davies, who then pledged the mortgage notes to us that he had gotten from the Mamou Power Company, Limited. * * * The Mamou Power Company was expecting to take these drafts — we insisted upon the payment of the drafts — and Mr. Davies, who was our client, told us that he was getting the Mamou Power Company, who were unable to pay the drafts, and owed him considerable more money, that he was getting from them a mortgage, and that he would give us the mortgage as collateral security on his indebtedness to us. * * * The mortgage itself was representing a debt due Frank Davies b,y the Mamou Power Company, and was pledged to us by Frank Davies to secure his indebtedness to us.”
The witness further said: That before the drafts were discounted Davies told them (the bank) that the company had just been organized with a paid-up capital of $80,000. That Davies sold it the machinery used by it, and that he got it from A. Baldwin & Co., Stauffer Eshleman & Co., and sundry concerns all over the country. That he was a dealer in machinery. That he (witness) obtained his information from Davies. That when the bank discounted the drafts Davies “stood high in New Orleans in a commercial way,” and that he still stood high when he pledged the mortgage notes. That the theory upon which the bank collected the proceeds, under the insurance policies, issued in favor of the Mamou Company, and. credited them to the account of Davies, was that the mortgage and the policies were held by the bank as collateral security for the obligation of Davies. That in December, 1907, Davies owed the bank not less than $22,000, for which the bank held, as collateral security, warehouse receipts or notes for cotton bagging, cotton tie buckles, and other such paper. That until October, 1909, when he learned that some of the securities which had been *727 pledged by Davies were forged, he believed them all to be genuine, and had full faith and confidence in Davies. That from the beginning of 1908 until the close of 1909 Davies was continually doing business with the bank, and paid it thousands of dollars, and the discounting of the drafts, with the bills of lading attached, was done in the usual course of business, and in good faith; there being nothing in the transaction to excite suspicion. That some of the insurance policies were assigned in blank up to the time of the fire, whilst others, which had been substituted for policies which had been canceled or changed, were not completed, and had to be completed at that time, but that they were all assigned in blank to the People’s Bank, That the insurance companies were notified of that fact immediately after the fire. That he means to say that the name of the bank had not previously been put in the assignments, that -such is the usual custom, and that it is only in ease of the execution of the assignment that the name of the holder is written in.
John J. Kennedy and M. M. Kohlman testified that they adjusted the loss, and that E. A. Sammons, president of the plaintiff company, assisted them, as expert appraiser of the damage to the machinery. Prom their testimony, and the reports made by them at the time, it appears that the sound value of the property insured was found to have been $27,928.51, and that the damage for which the insurers were held liable was $11,066.16.
Considering the allegations of the petition and all the evidence adduced, we find that the following facts, and such others as may be hereafter mentioned, have been established, to wit:
Thank Davies was a man who, for several years, operated upon rather a large scale in the New Orleans market, had many transactions with plaintiff and with the bank up to a certain time, had the confidence of both, and had a high financial standing in the community at large. During the year 1907 he was instrumental in establishing the Mamou Power Company, Limited, a corporation which was intended to operate in the oil fields with machinery for compressing air, and probably other purposes, and which first went into -business upon the “Jenning” oil field. Whether he originally expected to control the company, or aided in its creation merely to bring into existence a customer for the machinery in which he dealt, does not definitely appear. In order that the company might be equipped for the business in which it was to engage, it was necessary that it should be supplied with boilers, engines, pumps, etc. (all of which, for convenience, may be called machinery), and Davies contracted with plaintiff to supply a portion, and probably a large portion, of the same; his contracts (according to the allegations of the petition) aggregating some $20,000, which amount he was to pay (presumably on delivery of the goods), part cash, and part in notes, running not longer than 90 days. The machinery bought from plaintiff began to arrive- in New Orleans in January, and other shipments arrived early in February, 1908, the whole of it consigned to the plaintiff company, by which, however, the bills of lading were indorsed in blank and turned over to Davies. It does not appear that there was any agreement between plaintiff and Davies as to the disposition that should be made by him of the bills; but it does appear that plaintiff’s president was informed, and, as we conclude, about the dates of the transactions, that he had pledged them to the bank, and had obtained money on them. It is not shown what disposition he made of the money so obtained, or any part of it, though it may reasonably be inferred that part of it at least was used in paying plaintiff on account of the price of the machinery. He at that time, and before obtaining the *729 advances on the bills of lading, owed the . bank $22,000 or more, for which the bank held collateral security in the form of what purported to be notes, or warehouse or railroad receipts, for cotton bagging, cotton tie buckles, and other merchandise, which collateral, however, had been held subject to change, decrease, or augmentation, as transactions were closed or entered into, or as the convenience of Davies or the policy of the bank required. On January 23, 1908, Davies presented to the bank, for discount, a draft for $3,500, drawn by him, individually, on the Mamou Company, at 30 days’ sight, and which, as we infer (though there is no positive evidence to that effect), purported to have been accepted by that company when so presented, to which draft there was attached a bill of lading, issued in the name of the plaintiff herein, indorsed by plaintiff in blank, and calling for a “car load” of machinery, without other identification of the machinery, save, perhaps, the number or other description of the car. Davies represented that the drawee of the draft (the Mamou Company) was a corporation that had just been organized, and that it had a paid-up capital of $30,000, and the bank thereupon discounted the draft, and placed the proceeds to the credit of Davies’ individual account. And a similar draft, with a similar bill of lading attached, was similarly discounted on February 5th following (before the first draft had matured or been dishonored).
In view of the acceptance of the drafts, though upon the strength of its confidence in Davies, rather than upon the credit of the Mamou Company, of which the bank knew nothing, save what it had learned from Davies, the bank permitted the machinery to be shipped and delivered to the company. Thereafter, when the drafts matured and were not paid, it caused them to be protested, and the drawer notified, and then entered into a correspondence ■ with the drawee concerning them, in which the drawee gave repeated assurances that it expected to pay them. A few weeks later (after the dishon- or of the last of the two drafts) Davies, the drawer, informed the bank that the company was largely indebted to him, and that he expected it to give him notes for its debt, secured by mortgage on its plant, including the machinery, which obligations he would turn over to the bank, as an addition to the collateral already in the hands of the bank for the security of the debt due by him; and the bank accepted the offer, and took no steps against either the drawer or the drawee of the drafts. On March 31, 1908, accordingly the Mamou Company executed ten promissory notes for $2,500 each, payable to its own order, indorsed in blank, and secured, or purporting to be secured, by a mortgage on its entire plant, consisting of certain surface rights upon a lot of ground in the Jennings oil' field, a frame building, its machinery, and such other improvement as were on the lot; and the notes were delivered to Davies, and by him to the bank. The act of mortgage contained a stipulation to the effect that the mortgagor should keep the mortgaged property insured, otherwise that the holder of the notes should have the right to effect the insurance, and that the premium should be included in the mortgage, and the stipulation was complied with; that is to say, the mortgagor insured the property for $20,000, and turned the policies over to the bank, with assignments indorsed thereon. At what time the policies were so delivered is not definitely shown; but plaintiff, in its petition, alleges that it was in or about the month of June, 1909. Again, though it is shown that the assignments were duly executed by the mortgagor, as the original beneficiary, it is not altogether clear that the name of the assignee was filled in when the policies were delivered, though the testi *731 mony of the assistant cashier of the bank would perhaps authorize the conclusion that the policies were originally delivered at some time prior to June, 1909, and, as thus delivered, bore assignments in full, but that, whether because they expired or for other reason, the policies originally delivered to the bank, or some of them, were replaced by others, and that, as to the latter, the name of the assignee was not filled in until after the fire, when it was done in accordance with the requirements of the insurance companies. About the month of June, 1909, Davies, who was probably at that time in entire control of the company, concluded that it could make no money in the Jennings field, and that it would be advisable to remove the plant to the Caddo field, and he applied to the bank for a loan for that purpose, and the bank loaned $1,000, and subsequently several thousands more. On October 23d following the plant, then in the Caddo field, was partially destroyed by fire, and the representatives of the insurance companies went to the scene to adjust the loss. One of the adjusters, Mr. Kohlman, telegraphed to plaintiff’s president to accompany them, and give them the benefit of his expert knowledge of the value of machinery, which he did; and, the sound value of the property covered by the insurance having been found to have been $27,-■928.51, and the loss by the fire to have been $11,066.16, the loss was adjusted at the amount last mentioned, which was paid by the insurance companies to the bank, to the knowledge of plaintiff, and with no objection on its part that was brought to the attention of either the companies or the bank, though plaintiff’s president testifies that he complained to Davies, who quieted him with a promise that, if he would make no “fuss,” his claim would be paid in full. The fire occurred at 4:30 o’clock a. m., October 23, 1909, and some time later on the same day in New Orleans, a written instrument was executed -which bears the signatures of the plaintiff, of “Mamou Power Company, p. p. Frank Davies,” and of “Frank Davies,” which instrument recites that plaintiff is the holder of two notes for $1,884.83 and $1,884.84, respectively, signed by the “Mamou Power Co., Ltd., per pro Prank Davies, Trustee,” indorsed by Frank Davies, as surety, and made payable four months after date; that the consideration of the notes was the balance due for certain machinery sold by E. A. Sammons Company, Limited, to the Mamou Power Company, Limited, which machinery is described, and is said to be located in Caddo parish, and the payment of said sum (the recital continues) “being secured by the vendor’s lien and privilege, * * * as well as by the pledge of 120 shares of the capital stock of the Mamou Power Company, Limited. * * * Wherefore” — and then follows an agreement to the effect that Davies, for himself and his principal, shall pay $125 per week in reduction of the debt, and the holder of the notes shall defer bringing suit on them, week by week, as the payments are made, otherwise shall be at liberty to proceed, etc. The concluding paragraph reads:
“And it is agreed that, if the Mamou Power Company, Limited, or Frank Davies, shall find a purchaser for said property on which rests the lien of E. A. Sammons Company,-Limited, then this contract ends. And E. A. Sammons Company, Limited, shall receive the full payment of the balance of their claim, and said Frank Davies agrees to inform them of all negotiations for such a sale, and without waiting for its consummation.”
It appears that the counsel for plaintiff, who prepared the- instrument, was' not at that time aware that the machinery to which it refers had already been destroyed, or partially destroyed; and he states, in his testimony, that he does not know whether Davies was authorized to sign the instrument on behalf of the Mamou Company, and no one testifies that he was so authorized. At some time during the month of October, 1909, but *733 whether before or after the fire is not shown, the assistant cashier of the bank met Mr. Davies and some of the friends of the latter, and learned that certain goods, represented by receipts which Davies had pledged to the bank, had been taken out by him, and that certain documents, purporting to represent goods in warehouse or in cars, and which had been similarly pledged, had been forged. The assistant cashier was asked:
“Q. Now, Mr. Dabezies, between the time when you loaned Davies money, or when you bought the bills of lading — I think you testified— for the machinery which is referred to in plaintiff’s petition, and this conversation with Davies, * * * did you have any reason or cause to suspect Davies’ financial responsibility?” to which he answered, “No, sir.”
At some later date Davies went, or perhaps was forced, into bankruptcy, and later still, as we imagine (the date of the bankruptcy not being shown), he was indicted for forgery and convicted. We find in the transcript a notarial copy of what purports to be an act of date April 19, 1909, whereby the Mamou Company sells a lot of machinery, answering the description of that sold by plaintiff, to the Caddo Gas & Oil Company for $10,000 cash, with a stipulation to the effect that the vendor shall have the right to 'redeem the property upon the repayment of the $10,000, with interest, on or before August 10, 1909.
Opinion.
[1] Plaintiff’s right to stand in court for the prosecution of this suit rests upon its averment that, at the date of the transactions complained of, it was a creditor of the Mamou Power Company for the balance of the price of certain machinery sold to that company; but, taking the allegations of its petition, with the testimony of its president, called as a witness in its behalf, and other evidence in the record, it seems to us, notwithstanding that it has obtained what appears to be a consent judgment against that corporation, that it never was the creditor of the Mamou Power Company for the price of the machinery in question. The petition alleges:
“That said Davies caused to be organized the Mamou Power Company, Limited, * * * without permitting the use of his own name therein; the shares being taken in the names of his personal friends and associates, the bulk of the stock being issued to him later, being himself substantially the corporation itself, directing all its operations, attending to all its financial matters, and acquiring for_ it all the machinery and apparatus needed by it. * ■ * * That in the latter part of the year 1907 your petitioner sold to said Davies, for his said company, a large quantity of machinery, * * * upon which there remains due the sum stated in the foregoing judgment. That said machinery reached the city of New Orleans in the early part of the year 1908. That said Davies thereupon consigned the same, in Ms own name, to said company, * * * drawing^ two drafts, on time, for $3,500 each, against said consignments, and attaching bills of lading to said drafts, which drafts were accepted for said company by a person unknown to said bank, and having no connection with said company, and no right to accept for it; whereupon said bank, though knowing the impecunious condition of said Davies and his said company, bought said drafts, passing the proceeds to the credit of said Davies, and making his said company the debtor of said bank,” etc.
In the course of his examination as a witness, plaintiff’s president, as we have seen, gave the following, with other, testimony, to wit:
“Q.-Upon what terms was this machinery sold ? A. Different terms, at different times. I think the longest time was 90 days, as near as I remember. It was part cash, some of it— there was some cash paid, and some of the cash which was not paid, and we did accept notes. Q. Who paid the cash? A. Frank Davies. Q. Who made the notes? A. Frank Davies. Q. Individually? A. Mamou Power Company, per Frank Davies, president. * * * Q. Xou didn’t know much about the Mamou Company? A. No, sir, Q. Xou would not have extended them credit? A. Not without Davies’ say-so. Q. The person to whom you gave credit at that time was Davies? A. Really Davies. * * * Q. Xou had the machinery originally sent to E. A. Sammons Company, Limited? A. Xes, sir; according to the best of my recollection. Q. When that came here, on receipt of the bills of lading, you indorsed them in blank? A. Xes, sir; and handed them over to him, and he arranged the shipping from here. Q. Xou indorsed them in blank, and turned *735 them over to Prank Davies; there was nothing on the bills of lading, or in the indorsement, to show to a third person that any other party than Davies had any interest in the property covered by the bills of lading? A. No, sir.”
It will no doubt be conceded that a person who is said to buy property for another may be acting for the other person, or for himself; that is to say, if the president of a corporation enters a store and proposes to buy something for the corporation, it would ordinarily be understood that he was acting for, and by the authority and in the place of, the corporation itself, but, if he were to propose to buy a suit of clothes for his minor son, it would be understood that he was acting for himself, and wished himself to buy a suit of clothes, which he intended, after thus acquiring, to turn over to his minor son.
In the instant case Mr. Sammons makes it quite evident that the Mamou Company, in his estimation, occupied the relation of a minor son to Mr. Davies, and he says plainly that he sold the machinery to Davies solely upon Davies’ credit, and that he would not have extended the credit to his company. More than that, he says that the company was in such a condition that it really had no legal existence; thus, in answer to the question, “Have you the notes?” (referring to the notes given for the price of the machinery, and executed by “Mamou Power Company, per Prank Davies, President”), he answers:
“I think Judge Mentz has them. * * * They were also indorsed by him [Davies] personally, if I remember right, stating that, while he was president of the company, he was also acting as their broker, and would be responsible, because the Mamou Company had very little existence at the time. They had issued stock; but it had not been sold.”
[2] Let us concede, now, for the sake of the argument, that a concern purporting to be organized as a business or trading corporation, but which has sold none of its stock, can legally become bound by a contract entered into in its name with a person who is informed of its condition; and let us concede, in spite of Mr. Sammons’ testimony, that he understood that Mr. Davies was buying, not as a parent buys clothing for his children, but as the agent of a corporation buys merchandise, for and in the name of his principal. Still it can hardly be denied that one does not become or remain bound for the price of goods sold to him, and which the vendor is under the obligation to deliver to him, if, after the agreement for the sale is entered into, the proposed vendor delivers the goods to another person, to whom the proposed vendee, in order to obtain them, is obliged to pay the price. In other words, a vendee cannot, through no fault of his own, become bound twice, and to different persons, for the price of the same thing. And so, as it appears to us, even though it should be admitted that the Mamou Company was conditionally bound for the price of the machinery, because Davies, acting as its representative, made use of its name, nevertheless there was a condition to be complied with, to wit: That the vendor should deliver the thing sold to the vendee, and, if the Mamou Company was considered the vendee, then the thing sold should have been delivered to that company. The plaintiff, however, delivered the thing sold to Davies, and it is not pretended that it was delivered to him as the representative of the Mamou Company. Plaintiff indorsed the negotiable bills of lading in blank, which indorsement carried with it the title to things sold, and it delivered them to Davies, and, if its president did not know what Davies intended to do with them, he knew soon afterwards that he had used them as his own property, as in fact they were, and had transferred the title to them, and to the property represented by them, for a consideration of $7,000, to the bank, so that, when thereafter the Mamou Company came *737 into possession of the property, it did so, not by reason of any purchase from the plaintiff, but by reason of the fact that it bound itself unconditionally to pay the bank $7,-000, and because the bank, instead of demanding the payment in cash upon the delivery of the goods, delivered the goods upon the mere assumption by the company of that obligation. What the idea of the plaintiff was (when, nearly two years afterwards, and after the title to the machinery had passed through Davies and the bank, and into the Mamou Company, for the consideration stated) in drawing up a written contract between Davies and itself, containing a reference to its “vendor’s lien” upon the machinery, would be hard to explain.
[3, 4] Though authorized by the pleadings, the view thus expressed does not appear to have received the attention of the counsel in the argument of the case, and we should hesitate to rest our decision upon it were it not made patent upon the face of the record, by the admission and evidence made and offered by plaintiff itself, that it lost whatever status it may . have had as a creditor of the Mamou Company, for the price of the machinery, when it made its delivery to that company impossible by conveying the title thereto and delivering the goods to another person. It is true that plaintiff obtained a judgment against the Mamou Company on the notes executed by Davies in its name, which judgment contains the recital:
“This case came on this day [June 10, 1910] for trial by consent of the parties at interest.”
But the bank was not a party to the suit or to the consent, and is therefore entitled to the benefit of the provision of' the Civil Code which reads:
“Art. 1976. When the defendant in the action given by this section has not been made a party to the suit against the original debtor, he may controvert the demand of the plaintiff, although it may be liquidated by a judgment, in the same manner that' the debtor might have done before the judgment.”
The article quoted was applied, according to its plain meaning, in Lopez’s Heirs v. Bergel, 12 La. 197, and Pecot v. Armelin, 21 La. Ann. 667.
Judgment affirmed.